**John C. GILBERT, et al., Plaintiffs,**

v.

**DOEHLER–JARVIS, INC., et al., Defendants.**

**No. 3:99 CV 7395.**

United States District Court,
N.D. Ohio,
Western Division.

March 6, 2000.

Joan Torzewski, Lackey, Nusbaum, Harris, Reny & Torzewski, Toledo, OH, Roger J. McClow, Ellen F. Moss, Klimist, McKnight, Sale, McClow & Canzano, Southfield, MI, for Plaintiffs.

Michael S. Scalzo, Sr., Marshall & Melhorn, Toledo, OH, Jeffrey Cooper, Allan M. Dabrow, Steven R. Williams, Stanley Weinberg, Mesirou, Gelman, Jaffe, Kramer & Jamieson, Philadelphia, PA, for Defendants.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on cross motions for summary judgment, and on Plaintiffs' motion for a preliminary injunction. The Court finds that oral argument is not necessary. For the following reasons, Plaintiffs' motion will be granted. Defendant's motion will be denied. Plaintiffs' motion for a preliminary injunction will be denied as moot.

### BACKGROUND

Plaintiffs are retired employees or surviving spouses (collectively, "the Retirees") of the Defendant companies (collectively, "the Company"), who have received health care benefits pursuant to the terms of a Collective Bargaining Agreement ("CBA") between the parties. On June 10, 1999, the Company notified the Retirees that their health care benefits would be terminated effective October 31, 1999, upon the termination of the CBA. The parties dispute whether the retiree health care benefits are lifetime benefits under the CBA.

The Company acquired the three manufacturing facilities at which this dispute arose through an asset purchase from Farley Metals, Inc. on July 16, 1990.[1] On July 14, 1990, in anticipation of the asset purchase, the Company entered into an agreement with its employees, represented by the UAW, to abide by the terms of the CBA previously entered into between the employees and Farley Metals. That agreement provided that "each employee shall, except as otherwise provided herein, have rights, working conditions, benefits, etc. at least equal to that which she/he would have had if the purchase had not occurred." With regard to health care benefits, the Company specifically agreed that "each employee, dependent or beneficiary shall, in the aggregate, receive a benefit equal to but no greater than that which would have been paid if the purchase had not occurred," except that the Company would not be responsible for medical claims of employees who retired before July 16, 1990.

The CBA incorporated by the July 14, 1990 agreement provided, in relevant part, that the Company would provide health care benefits on behalf of the following:

(c) For Retired Employees

The Company will make monthly contributions for the following month's coverage on behalf of

(1) Retired Employees ... and,

(2) Employees terminating after age 65 ... with insufficient credited service to entitle them to a retirement benefit ....

(d) For Surviving Spouse

The Company will make monthly contributions ... on behalf of the surviving spouse (and the spouse's eligible dependents).

(1) Of an Employee ....

(2) Of an Employee who at the time of his death was eligible to retire ....

(3) Of a retired Employee if, prior to his death, he was receiving a benefit under Article II of the Doehler–Jar-

---

**1.** The manufacturing facilities at issue had previously belonged to the Company, which was a division of NL Industries at the time. In September of 1982, NL Industries sold the Company's assets to Farley Metals. Farley agreed at the time of that purchase to maintain the same benefits that had been provided under the previous CBA. Retiree health care benefits were first provided in 1965.

vis, Inc. Pension Plan for Wage Basis Employees. Contributions shall be continued until such time as the surviving spouse shall remarry.

(Insurance Program for Wage Basis Employees [hereinafter "Insurance Program"], Art. III, § 3.)[2] A general provision of the Insurance Program provides that the "Insurance Program shall continue in effect until termination of the collective bargaining agreement of which this is a part." (Id., Art. I, § 6.)

The CBA at issue was to terminate on October 31, 1999; however, an extension for several months was negotiated. The parties dispute whether the retiree health care benefits survived the termination of the CBA. The Retirees allege that the benefits in issue are vested lifetime benefits. The Company alleges that the benefits ended with the termination of the CBA. Both sides have moved for summary judgment, and the issue has been fully briefed. Plaintiff has moved for a preliminary injunction requiring the Company to continue the health care benefits during the pendency of this suit. The Court discusses the parties' contentions below.

### DISCUSSION

#### A. Summary Judgment Standard

As an initial matter, the Court sets forth the relative burdens of the parties once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

#### B. Vesting of Retiree Insurance Benefits

The issue before the Court on these cross motions for summary judgment is whether the CBA at issue creates a vested right in retirement benefits. ERISA divides employee benefit plans into two types: pension plans and welfare benefit plans. 29 U.S.C. § 1002(1), (2)(A). A retiree health insurance benefits plan is a welfare benefit plan, which is not subject to statutory vesting requirements. The parties to an employment agreement can, however, agree by contract to vest the benefits pursuant to such a plan. *Golden*

---

2. The Company and its employees were covered by separate insurance documents covering different years during the relevant period.

The documents are virtually identical, and the Court treats them interchangeably for purposes of this analysis.

*v. Kelsey–Hayes Co.,* 73 F.3d 648, 653 (6th Cir.1996).

The Sixth Circuit set forth a set of principles to guide the Court in determining whether retiree insurance benefits continue beyond the expiration of a collective bargaining agreement in *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) v. Yard–Man, Inc.,* 716 F.2d 1476 (6th Cir.1983). Since any such surviving benefit must find its genesis in the collective bargaining agreement, the Court uses traditional rules of contract interpretation to determine the expressed intent of the parties.

> [T]he court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance.... Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy.

*Id.* at 1479–80 (citations omitted).

Accordingly, the Court first looks to the explicit language of the Insurance Program involved in this case for evidence as to whether the parties intended the retiree health care benefits to survive the expiration of the CBA. No durational limit is given in Article III of the Insurance Program, which describes the benefits. A general durational clause in another sec-

tion of the Insurance Program provides that "[t]his Insurance Program shall continue in effect until termination of the collective bargaining agreement of which this is a part."

■ A general durational clause that refers to the duration of the *agreement,* as opposed to the duration of the *benefits described in that agreement,* does not outweigh *Yard–Man*'s presumption that retiree health benefits are intended to outlast the life of a particular CBA. *Yard–Man,* 716 F.2d at 1482; *Fox v. Massey-Ferguson, Inc.,* 172 F.R.D. 653, 677, *aff'd,* 91 F.3d 143, 1996 WL 382272 (6th Cir. 1996) (unreported); *Schalk v. Teledyne, Inc.,* 751 F.Supp. 1261, 1265 (W.D.Mich. 1990), *aff'd,* 948 F.2d 1290, 1991 WL 238343 (6th Cir.1991) (unreported). The durational clause cited by the Company refers to the duration of the "Insurance Program," not to the duration of benefits. If other evidence demonstrates that retiree benefits were intended to .outlive the CBA, that intent will outweigh any contrary implications derived from a non-specific general durational clause.

Since the only durational clause in the Insurance Program documents is non-specific, the Court takes the next step in the *Yard–Man* analysis by looking to the larger context in which the agreement exists. The Court may also use extrinsic evidence to aid in its determination of whether the parties intended the retirement benefits to survive expiration of the CBA. *Wulf v. Quantum Chem. Corp.,* 26 F.3d 1368, 1376 (6th Cir.1994).

The *Yard–Man* Court began its analysis by looking at other provisions of the entire CBA for evidence of intent and an interpretation of the specific provisions relating to retirement insurance benefits that would be harmonious with the entire document. For instance, the Court pointed to the fact that termination of insurance benefits for active employees was explicitly set out, while termination of insurance benefits for retirees was not, as evidence that no termination was intended for retirees.

Similarly, the Court found that the inclusion of specific durational limitations in other provisions of the CBA, but not the retirement benefit provisions, indicated that the retiree benefits were intended to survive the expiration of the CBA. *Yard–Man*, 716 F.2d at 1480–82.

The other provisions of the Insurance Program here at issue provide evidence that the parties intended to create vesting insurance benefits in the Retirees which continue beyond the life of the CBA. First, in this case, as in *Yard–Man*, the Insurance Program documents explicitly set out conditions for the termination or suspension of insurance benefits for active employees—such as layoffs and work stoppages—and those conditions are typically inapplicable to retirees. *See* 716 F.2d at 1481; (Insurance Program, Art. III, §§ 5 & 10.) Moreover, there are variations in the duration of insurance benefits available to active employees dependent upon their seniority. (Insurance Program, Art. II, § 5(b); Art. III, § 3(b).) These variations and the impracticality of hinging retiree benefits to events as unpredictable and unstable as active worker layoffs or work stoppages makes it improbable that retiree benefits were intended to depend in duration upon the fortunes of the active employees.

Second, the insurance provisions limit to 24 months health insurance coverage for a retiree's spouse and dependent children in case of the retiree's death. (Insurance Program, Art. III, § 3(d)(1).) While this limitation does not preclude an intent to terminate the retiree's benefits with the expiration of the CBA, it is more reasonable to infer that the spouse-dependent child provision was meant as an exception to the anticipated continuation of benefits beyond the life of the CBA.

Third, the Insurance Program also limits health insurance coverage for a retiree's surviving spouse "until such time as the surviving spouse shall remarry." (Insurance Program, Art. III, § 3(d)(3).) The inclusion of this specific durational limitation in one section of the benefits description, with no other durational limitation on the benefits, suggests that retiree benefits were intended to survive the expiration of the CBA.

Fourth, the negotiating context in which the benefits arose indicates that the benefits were intended to be vested. Retirement benefits are typically understood as a form of delayed compensation for present services, for which workers forego present wages. *Allied Chem. Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 180, 92 S.Ct. 383, 398, 30 L.Ed.2d 341 (1971). It is unlikely that workers would leave a significant portion of their remuneration to the contingencies of future bargaining agreements, especially since they are presumably aware that the union is not obliged to bargain for continued benefits for retirees. *See Yard–Man*, 716 F.2d at 1482. The Retirees have provided unrebutted evidence in the form of affidavits from individuals who negotiated the original CBA that all parties intended the retiree health insurance benefits to be vested, lifetime benefits. They have also provided unrebutted evidence that Farley consistently and repeatedly represented to its employees that the benefits at issue were lifetime benefits.

The Company has argued at length that it cannot be bound by Farley's representations because the 1990 purchase was merely an asset purchase, and the Company assumed neither the CBA nor Farley's liabilities. That argument lacks merit. Although a simple asset purchase would not have bound the Company to Farley's representations, the Company has neglected the fact that it contractually agreed to provide each employee with "benefits, etc. at least equal to that which she/he would have had if the purchase had not occurred." The Company argues that it agreed merely to maintain the same "scope" and "level" of benefits, but never agreed to provide benefits for the same duration. That is not what the contract says. The contract says that the Company will provide each employee with "benefits,

etc. at least equal to that which she/he would have had if the purchase had not occurred." It is beyond cavil that three years of health care benefits is not equal to lifetime benefits. If the contract between the UAW and Farley provided for lifetime retiree health care benefits, the amount of health care benefits that each employee "would have had if the purchase had not occurred" is lifetime benefits.

The Company has also argued that the relevant time period this Court should use to evaluate the course of dealings between the Company and its employees with regard to retiree health care benefits is the post–1990 period, after the asset purchase. Around the time of the asset purchase, the Company instructed its human resource employees to stop representing to employees that their retiree health care benefits would be lifetime benefits. The Court disagrees that only post–1990 history is relevant to determining whether the Company's course of conduct indicates that continuing insurance benefits for retirees were intended. The Company undertook by contract to maintain the same insurance benefits that had been provided by Farley and its predecessor. The evidence is unrebutted that Farley and its predecessor treated the benefits at issue as lifetime benefits. The evidence is unrebutted that Farley's predecessor continued to provide its retirees with health care benefits after the 1975 shutdown of its Grand Rapids facility and the 1982 shutdown of its Batavia facility.

Further, as the *Yard–Man* Court explained, retiree benefits are in a sense "status" benefits which carry an inference that they continue so long as the prerequisite status in maintained.

The evidence provided by the Retirees in this action is remarkably similar to the evidence the *Yard–Man* Court found sufficient to sustain a grant of summary judgment in the retirees' favor in that case. Despite the significant evidence that the parties intended continuing insurance benefits for retirees, the Company argues that it is entitled to summary judgment that

the retiree insurance benefits do not survive the termination of the CBA.

First, the Company argues that some portions of *Yard–Man* that favor the Retirees either (1) should be overturned, or (2) were overturned *sub rosa* in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir.1998). The Court does not agree. The Sixth Circuit has repeatedly affirmed that *Yard–Man* remains the law of this Circuit. *See International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, its Local Union No. 540, v. BVR Liquidating*, 190 F.3d 768 (6th Cir.1999). *Yard–Man*'s presumption that retiree insurance benefits survive the termination of the CBA remains the law of this Circuit. 716 F.2d at 1482. *Yard–Man*'s rule that a clear manifestation of intent is not required as to the duration of a retirement health care benefit remains the law of this Circuit. *Id.* at 1481 n. 2.

Next, the·Company points out that the UAW never raised the duration of retiree health care benefits during the negotiations of the 1993 and 1996 CBAs, although the UAW was on notice of the Company's position that the benefits at issue ended upon the termination of the CBA. The Company argues that the UAW's failure to raise the issue indicates an intent for the benefits to terminate with the CBA. That argument lacks merit. The evidence that the retiree health care benefits were intended as lifetime benefits prior to 1990 is substantial. The UAW was not required to bring up negotiations for a benefit it already had. Furthermore, although the UAW never raised retiree health care benefits during CBA negotiations, it is equally true that the Company never raised the issue of the duration of retiree health care benefits, although it was on notice of the UAW's position that the benefits at issue survived the termination of the CBA. If the Company wished to alter a practice of providing lifetime retiree health care benefits that had been in place since 1965, it could have raised the issue during negotia-

tions as easily as the UAW. If anything, the fact that the issue was never raised in post–1990 contract negotiations tends to indicate that the parties intended to maintain the status quo—and the status quo prior to 1990 was lifetime benefits.[3]

■] Finally, the Company argues that it is entitled to summary judgment because the Summary Plan Descriptions it has provided to employees since 1990 contain an express reservation of the right to modify or terminate plan benefits. That argument also lacks merit. If the underlying documents at issue in this case preserved to the Company a right unilaterally to modify or terminate plan benefits,[4] the presence of that language in the SPD would bolster the Company's position. In this case, however, the Insurance Program documents do not give the Company a unilateral right to modify or terminate plan benefits. The Company cannot validly claim in a SPD a right the plan documents do not give it.

The Company argues that it should be entitled to rely on its own SPD because "statements in a summary plan are binding and if such statements conflict with those in the plan itself, the summary shall govern." *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir.1988). The Company misstates the law. It is unquestionably true that a promise made in a SPD is binding *on the employer* regardless of conflicting language in a master agreement. *Helwig v. Kelsey–Hayes Co.*, 93 F.3d 243, 249 (6th Cir.1996). But the employer cannot rely on its own SPD to create a right the underlying insurance documents do not give it. The Company has cited to no case supporting such a proposition, and this Court is unaware of any such case.

Beyond lacking case-law support, the Company's argument is patently absurd.

Employees are entitled to rely on an employer's representations in a SPD under the principles underlying equitable estoppel, and to effectuate Congress' intent to "create disclosure requirements which would enable the individual participant to know exactly where he stands with respect to the plan"; and also it serves "to arm employees with enough information to enable them to enforce their rights." *Helwig*, 93 F.3d at 249. Adopting the Company's position in this case would accomplish none of those goals. Equitable estoppel principles allow an employee reasonably to rely on an employer's representations; they do not allow an employer unilaterally to impose a change on an employee subject to a CBA merely by giving notice of that change. In addition, the Company's position, rather than enabling employees to be certain of their rights under a plan, would create confusion by making it impossible for employees to rely on the plan documents themselves. Most importantly, this Court will not countenance a rule that could permit a company to unilaterally take away contractually bargained-for rights. *International Ass'n of Machinists v. Masonite Corp.*, 122 F.3d 228, 233 (5th Cir.1997) (citing *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1297 (6th Cir.1991)). The reservation of rights clause in the SPD does not provide probative evidence of an intent to end retiree health care benefits at the termination of the CBA.

In summary, the CBA and Insurance Program involved in this case contain no explicit language tending to show that the retiree health care benefits in dispute were not intended to be lifetime benefits. Several portions of the Insurance Program contain language indicating that the disputed benefits were intended to survive the termination of the CBA. The negotiation history of the Insurance Program

---

**3.** *Compare BVR Liquidating*, 190 F.3d at 774 ("When interpreting a collective bargaining agreement this court assumes that terms from previous collective bargaining agreements continue unchanged unless specifically renegotiated.")

**4.** This was the case in *Sprague*, upon which the Company places great reliance. *See* 133 F.3d at 393 n. 2, 401.

demonstrates unequivocally that the disputed benefits were intended to be lifetime benefits. The Company's course of dealings with its employees over the past thirty-five years is somewhat equivocal, but overall indicates that the disputed benefits were treated as lifetime benefits. In light of this overwhelming evidence, and in view of *Yard–Man*'s presumption that retiree insurance benefits survive the termination of a CBA, the Court finds that entry of summary judgment in the retirees' favor is appropriate.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted, and Defendant's motion for summary judgment is denied.

IT IS SO ORDERED.